# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

EVONIK CORPORATION,

    *Plaintiff/Counterclaim Defendant,*

    v.

HERCULES GROUP, INC.,

    *Defendant/Counterclaimant.*

Civil Action No. 16-7098
(JMV)(JBC)

**OPINION**

**John Michael Vazquez, U.S.D.J.**

Plaintiff Evonik Corporation ("Plaintiff" or "Evonik") sued Defendant Hercules Group, Inc. ("Defendant" or "Hercules") for breach of contract concerning Evonik's sale of superabsorbent polymer products ("SAP") to Hercules. Hercules counterclaimed that Evonik actually breached the agreement, as well as an earlier contract, by overcharging Hercules. Currently pending before the Court is Plaintiff's motion to strike Defendant's Second Amended Answer and Counterclaims, and alternately, to dismiss Defendant's counterclaims.[1] The Court

---

[1] Plaintiff's moving papers are not entirely clear as to the relief it seeks. Plaintiff's notice of motion indicates that it is moving to dismiss Defendant's "Second Amended Counterclaim [singular]." D.E. 41. Plaintiff's supporting brief, however, states that Plaintiff is moving to dismiss the "Second Amended Answer and Counterclaim [singular]." D.E. 41-1. A review of Plaintiff's Brief makes clear, however, that Plaintiff is seeking to dismiss Defendant's Second Amended Answer and Counterclaims due to a procedural irregularity. Alternately, Plaintiff requests that *all* counterclaims be dismissed. *Id.* Defendant addressed Plaintiff's substantive arguments. As a result, the Court addresses the issues raised in Plaintiff's moving brief.

reviewed the parties' submissions,[2] and decided the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the following reasons, Plaintiff's motion to strike is **DENIED** and Defendant's cross-motion to file its First Amended Answer with Counterclaims is **GRANTED**. The Court treats Defendant's First Amended Answer with Counterclaims as filed on October 10, 2017. Plaintiff's motion to dismiss the counterclaims is **GRANTED**.

## I.    FACTUAL BACKGROUND

### A. Evonik's Complaint

The following facts are taken from the Complaint, D.E. 1 ("Complaint" or "Compl."). Plaintiff Evonik is an Alabama corporation with a principal place of business in New Jersey. Compl. ¶ 3. Defendant Hercules is a New York corporation with its principal place of business in New York. *Id.* ¶ 4. The parties entered into a supply agreement effective on January 12, 2015, in which Evonik agreed to supply SAP to Hercules. *Id.* ¶ 7, 8. SAP is used for personal care products, such as baby diapers and training pants. *Id.* ¶ 8, 9. The Supply Agreement lasted until December 31, 2015 and automatically renewed, in one-year increments, unless terminated. *Id.* ¶ 10. Hercules failed to pay a total of $8,610,672 for invoices between July 25, 2015 and April 28, 2016. *Id.* ¶ 12. Hercules also failed to purchase the minimum amount of product from Evonik. *Id.* ¶ 14, 15.

---

[2] The following briefs were submitted in connection with this motion: Evonik Corporation's Motion to Dismiss Hercules Group, Inc.'s Second Amended Answer and Counterclaim, D.E. 41, hereinafter "Plaintiff's Brief" or "Pl. Br."; Hercules' Memorandum of Law in Opposition to Plaintiff's Motion to Dismiss and in Support of Defendant's Cross-Motion for Leave to Amend, D.E. 49, hereinafter "Opposition" or "Opp."; Evonik's Reply Brief in Further Support of Evonik Corporation's Motion to Dismiss Hercules Group, Inc.'s Second Amended Answer and Counterclaim, D.E. 50, hereinafter "Reply" or "Reply Br."

## B. Hercules' First Amended Answer with Counterclaims

The following facts are taken from Hercules' First Amended Answer with Counterclaims, D.E. 39 ("Answer" or "Ans.").[3] Hercules specialized in obtaining Humanitarian Trade Licenses from the Unites States Office of Foreign Assets Control ("OFAC") for conducting humanitarian trade with the Republic of Iran. Ans. ¶¶ 61, 64. Hercules' trade with Iran included the sale of SAP, for use in feminine hygiene products and disposable baby diapers, to Iranian companies Zarrin Cellulose Company, Zarrin Teharat Khavar Mianeh Company, and Savaplast Company (collectively "Zarrin"). *Id.* ¶¶ 72, 78, 104, 105, 107.

Hercules began purchasing SAP exclusively from Evonik's predecessor, Dow Chemical Company ("Dow") in 2008. *Id.* ¶ 75. Hercules alleges that it was understood between the parties that SAP would be sold to Hercules at the regional market price for the Middle East. *Id.* ¶¶ 83, 89. Hercules claims that Dow sold SAP to it at "Regional" pricing, "Differential" pricing, or Middle Eastern Regional Pric[ing.]" (collectively, "Middle East Regional Pricing" or "MERP"). *Id.* ¶¶ 80, 83, 84 87, 90, 99. The MERP reflects a price lower than the price for goods that are intended to remain, and be used, in the United States. *Id.* ¶ 88.

Prior to 2012, Hercules and Dow (and later Evonik)[4] conducted their business through the use of purchase orders, in which the terms of the deal were discussed and agreed upon either verbally or in writing. *Id.* ¶ 90. In or around September 2011, Evonik's representatives, Peter Petit and Scott Tomlin, met with Hercules' representatives, Cyrus Amani and Sara Amani, to discuss Evonik's demand for a formalized contract between the parties. *Id.* ¶ 91. Evonik indicated that it would end its business relationship with Hercules absent a written contract. *Id.* Evonik's

---

[3] On a motion to dismiss a counterclaim, the Court relies on the facts alleged in the counterclaim and attached exhibits. *See* Fed.R.Civ.P. 12(d).

[4] Hercules does not indicate when Evonik succeeded Dow.

representatives assured Hercules that SAP would continue to be sold at the MERP, and this promise was reiterated in December 2011. *Id.* ¶¶ 91, 94. In exchange, Hercules agreed to purchase its SAP exclusively from Evonik. *Id.* ¶ 99. Supply Agreements were executed by the parties in 2012 and 2015, and both Supply Agreements included a formula for calculating the price of SAP. *Id.* ¶¶ 73, 96-98; Exs. A-B. Hercules claims that both Agreements indicated that Evonik would apply the MERP to the SAP sold to Hercules. *Id.* ¶¶ 99. Hercules further claims that Evonik kept the SAP price calculations confidential. *Id.* ¶ 100.

In May 2016, Zarrin alerted Hercules that the price of SAP in the Middle East was "substantially lower" than what Evonik had been charging Hercules. *Id.* ¶ 104. Hercules discovered that, throughout the terms of both the 2012 and 2015 Supply Agreements, Evonik neither adhered to the prescribed pricing formula nor charged Hercules the MERP. *Id.* ¶¶ 101-02. This resulted in Hercules being "grossly overcharged" by the "aggregate sums in the tens of millions of dollars." *Id.* ¶¶ 103, 106. Zarrin advised that "serious market discrepancies existed between Evonik's price in Turkey and Evonik's price to the Iran market." *Id.* ¶ 105. In June 2016, Hercules issued a "chargeback report" to Evonik detailing the amount Hercules was overcharged based on the MERP, which totaled in the tens of millions of dollars. *Id.* ¶ 106. Evonik has refused to refund the alleged overcharged amounts to Hercules. *Id.* ¶ 107.

## C.  2012 and 2015 Supply Agreements

The 2012 Supply Agreement between Evonik and Hercules was entered into on January 17, 2012 and was effective through December 31, 2014 with automatic renewal and termination provisions. Ex. A at 1-2, ¶ 5. Evonik agreed to sell SAP to Hercules, and Hercules agreed to certain purchase obligations. *Id.* at 1-2. The Agreement indicated that the governing law was New Jersey. *Id.* at 5, ¶¶ 13-14. The Agreement's integration clause provided that "[t]he Agreement

contains the entire agreement of the parties with respect to the subject matter hereof and supersedes and replaces all other understandings and agreements, whether oral or in writing, if there be any, previously entered into by the parties with respect to such matter." *Id.* at 5, ¶ 15.

The purchase price was set forth in "Exhibit A: Purchase Price, Orders, Shipping and Payment Terms,"[5] ("Purchase Price Addendum") *Id.* at 2, ¶ 3. Section 1 of the Purchase Price Addendum was entitled, "Purchase Price Adjustments" and contained a specific formula for pricing. *Id.* at 7. The section also provided that the purchase price would automatically be adjusted depending on the cost of Evonik's raw materials. *Id.* The section included definitions for "Adjusted Product Price" or "Pnew"; "Base Caustic Soda Price" or "NaOH base"; "Base Product Price" or "Pbase"; "Base Propylene Price" or "C3base"; and "CMAI" for "Chemical Market Associates Inc." *Id.* Under the "Payment" section, Hercules must submit purchase orders pursuant to the Agreement and remit payment to Evonik within 40 days of the invoice date. *Id.* at 9, ¶ 4.

Importantly, the Agreement expressly provided that six times during the year, at two-month intervals, the parties "shall determine the Adjusted Product Price based on the Published Propylene Price and the Published Caustic Soda Price" for the preceding two months. *Id.* at 8. In section 1(b)(vi) of the Purchase Price Addendum, the "Published Caustic Soda Price" or "NaOHpub" is defined as "the arithmetic average of the prices reported in CMAI's monthly *Global Chlor-Alkali Market Report* for Caustic Soda, United States, average acquisition FOB US Golf Coast (US$ per Dry Short Ton) during the two (2) proceeding calendar months[.]" *Id.* at 7. In section 1(b)(vii), the "Published Propylene Price" or "C3pub" is defined as the "arithmetic average of the prices

---

[5] "Exhibit A: Purchase Price, Orders, Shipping and Payment Terms" is attached to and expressly incorporated in the 2012 Supply Agreement (and also the 2015 Supply Agreement). It is, not to be confused with the exhibits that Hercules attached to their First Amended Answer with Counterclaims, one of which is also entitled "Exhibit A."

reported in the 'U.S. Propylene Price History Forecast' section of CMAI's monthly *Monomer Market Report* for Propylene, Chemical Grade Contract (US cents/pounds) during the two (2) preceding calendar months[.]" *Id.*

The 2015 Supply Agreement was, for all relevant purposes, substantively the same as the 2012 Supply Agreement. Ex. B. It began on January 12, 2015 and was effective through December 31, 2015. *Id.* at 1-2, ¶ 5. The Agreement also automatically renewed for one-year periods unless either party first terminated the contract. *Id.* The 2015 Supply Agreement contained a miscellaneous provision, indicating that the agreement superseded and replaced all prior agreements between the parties. *Id.* at 5, ¶ 15. It also had a Purchase Price Addendum, which essentially mirrored the addendum to the 2012 Supply Agreement, with certain minor changes. *Id.* at 7. For example, CMAI was replaced with "IHS" or "IHS Global Insights." Id.

Notably, neither the 2012 nor the 2015 Supply Agreement, nor the Purchase Price Addendum to either, make any reference to the MERP or any similar terms, such as Regional Pricing or Differential Pricing. The absence of any reference to MERP directly undercuts Hercules' allegation that both Agreements indicate that Evonik will apply the MERP to the SAP sold to Hercules.

## II.    **PROCEDURAL HISTORY**

Evonik filed its Complaint on October 13, 2016, listing four counts: (1) failure to pay amounts due; (2) breach of contract; (3) negligent misrepresentation; and (4) breach of the implied covenant of good faith and fair dealing. D.E. 1 ¶¶ 19-39. Hercules filed its Answer on January 20, 2017, which included counterclaims. D.E. 8, 10. Evonik followed with a motion to dismiss. D.E. 15. While the motion to dismiss was pending, Hercules filed a cross-motion to amend its Answer and Counterclaims. D.E. 23. As required by the local rules, Hercules included a copy of

its proposed First Amended Answer with Counterclaims. D.E. 23-3. On September 25, 2017, the Court granted Hercules' motion for leave to amend and administratively terminated Evonik's pending motion to dismiss, granting Evonik the right to file a motion to dismiss as to Hercules' First Amended Answer and Counterclaims. D.E. 38.

Hercules, however, did not file its proposed First Amended Answer and Counterclaims. Instead, without leave of court, Hercules filed a First Amended Answer and Counterclaims which contained additional allegations, affirmative defenses, and a counterclaim than that in its proposed pleading filed in conjunction with its motion to amend. D.E. 39. When compared with the proposed pleading submitted to the Court, the filed First Amended Answer and Counterclaims contained additional factual allegations, an additional four affirmative defenses, and an additional counterclaim, for fraud in the inducement. *Compare* D.E. 23-3 *with* D.E. 39. Evonik refers to this pleading as the "Second Amended Answer and Counterclaims" in its current motion.

The filed First Amended Answer and Counterclaims contained nineteen affirmative defenses and eight counterclaims. The eight counterclaims are (1) breach of contract of the initial purchase orders; (2) breach of contract of the 2012 Supply Agreement; (3) breach of contract of the 2015 Supply Agreement; (4) breach of the duty of good faith and fair dealing; (5) tortious interference with contract; (6) tortious interference with prospective economic advantage; (7) unjust enrichment; and (8) fraud in the inducement. Ans. ¶¶ 108-149. The current motions followed.

### III.   STANDARD OF REVIEW

#### A.  Rule 12(f) Motion to Strike

Federal Rule of Civil Procedure 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed R. Civ.

P. 12(f). "This standard essentially translates into application of the standards of a Rule 12(b)(6) motion to dismiss, with the understanding that a motion to strike should be granted sparingly." *Eisai Co., Ltd. V. Teva Pharmaceuticals USA, Inc.*, 629 F.Supp.2d 416, 424 (D.N.J. June 26, 2009). "[M]otions to strike are highly disfavored." *Id.* To succeed on a motion to strike, the moving party must show that the allegations in the complaint "have no possible relation to the controversy and may cause prejudice to one of the parties, or [that] the allegations confuse the issues." *Garlanger v. Verbeke*, 223 F.Supp.2d 596, 609 (D.N.J. 2009).

### B. Rule 12(b)(6) Motion to Dismiss a Counterclaim

Federal Rule 12(b)(6) permits a motion to dismiss for "failure to state a claim upon which relief can be granted." A motion to dismiss a counterclaim is evaluated in the same manner as the motion to dismiss a claim in a complaint. *Signature Bank v. Check-X-Change, LLC*, 2013 WL 3286154, at *2 (D.N.J. June 27, 2013). Under this standard, the counterclaim must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of a counterclaim, the court must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). Restatements of the elements of a claim are legal conclusions, and therefore, are not entitled to a presumption of truth. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). The court will however accept the counterclaim's well-pleaded facts as true. *Fowler*, 578 F.3d at 210.

In a 12(b)(6) motion to dismiss, a district court may not rely on matters extraneous to the pleading sought to be dismissed. Fed.R.Civ.P. 12(d). A motion to dismiss a counterclaim must be decided "on the face of the counterclaim" along with other, limited information. *Lukoil N. Am. LLC v. Turnersville Petroleum Inc.*, 2015 WL 5455648, at *1 (D.N.J. Sept. 16, 2015). A district

considers the counterclaim itself, the attached exhibits, and matters of public record. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997).

## IV.    LAW AND ANALYSIS

### A. Motion to Strike the First Amended Answer and Counterclaims

Evonik argues that the entire First Amended Answer and Counterclaims (FAAC) should be struck from the record, because Hercules did not follow proper procedure in filing it. Pl. Br. at 12-13. Specifically, Evonik's claim is that Hercules submitted one proposed FAAC with its motion for leave to amend but then filed a different FAAC after the Court granted leave. Evonik is correct. The FAAC that Hercules filed contained additional factual allegations, additional affirmative defenses, and an additional claim than its proposed FAAC. Hercules does not contest this fact. Instead, Hercules explains that after the motion for leave to amend was filed, Hercules hired new counsel who identified the additional counterclaim and defenses. Opp. at 4. Hercules admits that it did not file a motion for leave to amend as to the FAAC that it filed, but instead, it sought Evonik's consent to file, which was not provided. *Id.*

Federal Rule of Civil Procedure 15 governs the amendment of pleadings. Once the period for amending as a matter of course has expired, a party may amend "only with the opposing party's consent or the court's leave." Rule 15(a)(2). Local Civil Rule 15.1 requires a party seeking leave to amend a pleading to, among other things, file a written motion and attach "a copy of the proposed amended pleading[.]" Here, Hercules had neither Evonik's written consent nor the Court's leave to file the FAAC. Instead, it had leave to file its proposed FAAC, which it never filed due to an apparent change in counsel. Thus, the FAAC was not filed pursuant to proper court procedure. Yet, the question remains whether the Court should strike the FAAC.

The standard governing leave to amend is that a "court should freely give leave when justice so requires." Rule 15(a)(2). Here, Evonik has not argued or demonstrated that it was unfairly prejudiced by the FAAC that Hercules did in fact file. Moreover, the FAAC filed added only several defenses and one counterclaim. *Arcand v. Brother Int'l Corp.*, 2010 WL 3907333, at *4 (D.N.J. Sept. 29, 2010) (denying motion to strike in similar circumstances due to the absence of demonstrated prejudice). Evonik relies on two cases in support of its motion: *U.F.C.W. Local 56 Health & Welfare Fund v. J.D.'s Mkt.*, 240 F.R.D. 149 (D.N.J. 2007) and *Bartels v. Hudson Ins. Co.*, 2008 WL 5070660 (D.N.J. Nov. 24, 2008). Both are inapposite because *U.F.C.W. Local*, 240 F.R.D. at 153, added new parties and *Bartels*, 2008 WL 5070660, at *3, converted a count into a class action request. Here, Hercules has neither added parties nor changed the fundamental nature of its defenses or counterclaims.

As a result, the Court denies Evonik's motion to strike and grants Hercules' cross-motion for leave to file the FAAC that was actually filed, retroactive to the date that it was filed. Yet, Hercules is represented by counsel, and counsel are cautioned to follow the correct procedures in the future when seeking to file a FAAC that is different than the one filed with its original motion for leave to amend. A change in counsel does not excuse failure to comply with the controlling rules of procedure.

### B. Motion to Dismiss the Counterclaims

The parties agree that New Jersey law applies. The 2012 and 2015 Supply Agreements both indicate that New Jersey law controls. Thus, the Court will apply New Jersey law. *See Manley Toys, Ltd. v. Toys R Us, Inc.*, 2013 WL 244737, at *2 (D.N.J. Jan. 22, 2013) ("Because the parties have argued the viability of the remaining claims as though New Jersey substantive law applies, the Court will assume that to be the case.") (citing *USA Mach. Corp. v. CSC, Ltd.*, 184

F.3d 257, 263 (3d Cir. 1999) ("[D]espite the interstate, and indeed international, nature of the putative transactions at issue, the parties have not chosen to address choice-of-law issues. . . . Because the parties appear to be in agreement on this issue, we will assume, without deciding, that Pennsylvania law supplies the appropriate substantive rules.)).

Before addressing the merits of the motions, the Court notes that Hercules attempts to rely on evidence which the Court cannot consider. Specifically, Hercules relies on an affidavit from its CEO filed in connection with Evonik's original Motion to Dismiss. Opp. at 12-13. Procedurally, such reliance is inappropriate because the affidavit was filed in connection with a motion that has since been terminated, and Hercules never incorporated the affidavit into its current opposition. Substantively, and more importantly, such information cannot be considered in ruling on a motion to dismiss. As noted above, in reviewing a motion to dismiss, a court accepts as true all well-pleaded facts in the counterclaim. *Fowler*, 578 F.3d at 210. A court also considers exhibits attached to the counterclaim and matters of public record. Finally, a court may rely on "a document integral to or explicitly relied upon in the [counterclaim]." *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (citation omitted). A court may not, however, consider an affidavit as proposed by Hercules.

Counts 2 and 3: Breach of Contract

The 2012 and 2015 Supply Agreements are contracts. To state a claim for breach of contract under New Jersey law, a party must allege (1) the existence of a contract; (2) breach of the contract; (3) damages as a result of the breach; and (4) that the complaining party performed its own duties under the contract. *Pollack v. Quick Quality Restaurants, Inc.*, 452 N.J. Super. 174, 188 (App. Div. 2017) (citing *Globe Motor Co. v. Igdalev*, 225 N.J. 469, 482 (2016)). In interpreting a contract, a court must determine the intention of the parties as revealed by the

language in the agreement. *Globe Motor*, 225 N.J. at 483 (citation omitted). To this end, the plain language of the contract is ordinarily the best indicator of the parties' intent. *Chubb Customs Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238 (2008) (citation omitted). In other words, unless an actual ambiguity in the contract exists, a court should not engage in a strained reading of the agreement to justify a different result than that which the parties bargained for. *Id.* (citation omitted). An ambiguity exists when a contract term is "susceptible to at least two reasonable alternative interpretations[.]" *Id.* (citing *Nester v. O'Donnell*, 301 *N.J. Super.* 198, 210 (App. Div. 1997)). If a contract's term is ambiguous, a court may consider extrinsic evidence to interpret the term. *Id.* (citation omitted). A court will also normally construe the ambiguous term against the drafting party if the parties had "unequal bargaining power." *Id.* (*Pacifico v. Pacifico,* 190 *N.J.* 258, 268 (2007)).

The parol evidence rule bars consideration of "any previous oral representations or agreements" that purport to "vary, modify, or supersede the written contract." NJSA 12A:2-202; *Genesis Bio Pharmaceuticals, Inc. v. Chiron Corp.*, 27 Fed. Appx. 94, 99 (3d Cir. 2002) (applying New Jersey law) (internal citations omitted). The parol evidence rule applies to oral and written agreements made before the agreement is signed, not after. Hercules acknowledges the effect of the rule: "While the express terms of a contract may not be contradicted by any evidence of a prior agreement or of a contemporaneous oral agreement, the contract terms may be explained or supplemented by the parties' course of performance, course of dealing, or usage of trade." Opp. at 15. Moreover, there is an integration clause in both Supply Agreements that provide as follows: "The Agreement contains the entire agreement of the parties with respect to the subject matter hereof and supersedes and replaces all other understandings and agreements, whether oral or in writing, if there be any, previously entered into by the parties with respect to such matter." Ex. A

at 5, ¶ 15; Ex. B at 5, ¶ 15. "In general, where a contract contains an integration clause, the parol evidence rule bars the introduction of evidence of extrinsic negotiations or agreements to supplement or vary its terms." *CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, 2016 WL 1718100, at *3 (D.N.J. Apr. 29, 2016).

Evonik first argues that Count 2 should be dismissed because the 2015 Supply Agreement superseded the 2012 Agreement. Pl. Br. at 23. The Court disagrees. As noted, the 2015 Supply Agreement does contain an integration clause which indicates that the contract "supersedes and replaces" all prior agreements between the parties. Ex. B at 5, ¶ 15. Hercules, however, is not claiming that Evonik breached the 2012 Supply Agreement based on actions after the effective date of the 2015 Supply Agreement. If this were the case, then Evonik would be correct. Instead, Hercules is claiming that while the 2012 Supply Agreement was in effect and before entry of the 2015 Agreement, Evonik breached the 2012 Agreement. Thus, Evonik's argument fails in this regard.

The Court also does not agree with Evonik's account stated argument. Pl. Br. at 24. Evonik argues that Hercules' breach of contract claim fails in part under the Accounts Stated Doctrine and quotes the Restatement (Second) of Contracts, § 282:

> (1) An account stated is a manifestation of assent by debtor and creditor to a stated sum as an accurate computation of an amount due to a creditor. A party's retention without objection for an unreasonably long time of a statement of account rendered by the other party is a manifestation of assent. (2) The account stated does not itself discharge any duty but is an admission by each party of the facts asserted and a promise by the debtor to pay according to its terms.

*Id.*

Yet, "[a]n account stated may always be impeached for mistake. It is *only [p]rima facie evidence* of its correctness." *Clarke v. Camden Tr. Co.*, 84 N.J. Super. 304, 310 (Law. Div. 1964)

(emphasis added), *aff'd*, 89 N.J. Super. 459 (App. Div. 1965). "The statement of an account is *not conclusive, but only presumptive evidence* against the party admitting the balance to be against him." *Vanderveer v. Statesir*, 39 N.J.L. 593, 596 (Sup. Ct. 1877) (emphasis added). "An account stated or settled is a mere admission that the account is correct. It is not an estoppel. . . . Its effect is to establish, prima facie, the accuracy of the items, without other proof." *Wilbur v. Win*, 89 N.J. Eq. 278, 283 (Ch. 1918) (internal quotation marks omitted). "[I]t is clear that the account stated doctrine operates generally as a rule of evidence, is primarily applicable to disputes between debtors and creditors over amounts owed, and may become binding only as the result of detrimental reliance." *Pan Am. World Airlines, Inc. v. Midatlantic Nat. Bank/N.*, 1989 WL 78229, at *5 (D.N.J. July 12, 1989). Because the doctrine provides *only prima facie* evidence of correctness and is not conclusive, it does not preclude the counterclaims as a matter of law.

Nevertheless, Hercules fails to make sufficient allegations to state a plausible claim for breach of contract. For example, Hercules states that Evonik did not sell the SAP pursuant to the MERP. In support, Hercules points to Evonik's prices in Turkey. FAAC ¶ 105. However, Hercules fails to allege that the prices in Turkey were in fact subject to MERP, so the example is lacking. More importantly, Hercules' breach of contract claims fails on a more fundamental level. The thrust of Hercules' argument is that Evonik promised to charge the MERP, and Hercules avers that under both the 2012 and 2015 Supply Agreements, Evonik agreed to the MERP. FAAC ¶ 99. Hercules' factual claims are completely undercut by the actual language in the 2012 and 2015 Supply Agreements. Neither Supply Agreement mentions MERP (or Regional Pricing or Differential Pricing). To the contrary, both Agreements set forth a formula and detailed definitions as to how the purchase price was to be calculated. They both provide a base price and then explicitly state the independent documents that would be used as a yardstick for adjusting the price:

(1) in the 2012 Supply Agreement, CMAI's monthly *Global Chlor-Alkali Market Report* for Caustic Soda, United States, average acquisition FOB US Golf Coast (US$ per Dry Short Ton), and CMAI's monthly *Monomers Market Report*'s "U.S. Propylene Price History and Forecast" section are listed, and (2) in the 2015 Supply Agreement, the CMAI Reports are substituted for IHS' monthly *Global Chlor-Alkali Market Report* and IHS' monthly *Monomers Market Report*.

While a party can make factual allegations, a court is not bound to accept them as true when the allegations are clearly contradicted by an underlying document on which the allegations rely. *ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 n. 8 (3d Cir.1994) ("Where there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control."); *see also Goldenberg v. Indel, Inc.,* 741 F.Supp. 2d 618, 624 (D.N.J. 2010). Here, neither Supply Agreement supports Hercules' contention that each contract expressly agreed to MERP pricing; the Agreements make no reference to MERP or any other similar term. And the parol evidence rule bars consideration of the alleged oral statements made by Evonik's representatives prior to the signing of the 2012 Supply Agreement.

In its opposition, Hercules admits that both the 2012 and 2015 Agreements had a pricing formula. Opp. Br. at 1-2. Although, Hercules does mention that the "calculation of the Formula Price and the components upon which it was based was kept confidential by Evonik," Hercules provides no support for this allegation, and the documentation provided appears to show the exact opposite. Hercules argues that Evonik waived the pricing formula in the Agreements due to Evonik's course of performance and conduct. Opp. at 16. Again, this conclusory allegation is not

supported by sufficient facts. To the contrary, it appears that Evonik always acted consistently with the pricing terms of both the 2012 and 2015 Agreements.[6]

In conclusion, Counts 2 and 3 are dismissed without prejudice for failure to plausibly plead a claim.

<u>Count 8: Fraud in the Inducement, and Count 1: Breach of Contract regarding Purchasing Orders</u>

To establish a claim for fraudulent inducement, a party must show the following: "(1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment." *RNC Sys., Inc. v. Modern Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012) (citing *Metex Mfg. Corp. v. Manson*, 2008 WL 877870, at *4 (D.N.J. Mar. 28, 2008)). Under New Jersey law, courts have "recognize[d] fraud in the inducement as an equitable remedy that may serve as the basis for rescission of a contract." *TekDoc Servs., LLC v. 3i-Infotech Inc.*, 2013 WL 2182565, at *21 (D.N.J. May 20, 2013). If fraudulent inducement is found, then the contract may be rescinded. *Tonglu Rising Sun Shoes Co. v. Nat. Nine (USA) Co.*, 2016 WL 7374543, at *3 (D.N.J. Dec. 20, 2016). Because to the claim alleges fraud, such pleadings are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Kare Distribution, Inc. v. Jam Labels & Cards LLC*, 2009 WL 3297555, at *4 (D.N.J. Oct. 9, 2009). Fraud in the inducement can also provide an exception to the parol evidence rule. *Harker v. McKissock*, 12 N.J. 310, 323

---

[6] Hercules does not argue that the language of the Agreements is ambiguous. As noted, "[g]enerally, the terms of an agreement are to be given their plain and ordinary meaning." *M.J. Paquet, Inc. v. N.J. Dep't of Transp.*, 171 N.J. 378, 396 (2002) (citation omitted). "But when 'the terms of the [agreement] are susceptible to at least two reasonable alternative interpretations,' the language is ambiguous." *Highland Lakes Country Club & Cmty. Ass'n v. Franzino*, 186 N.J. 99, 122 (2006). The Court also does see any apparent ambiguity in either Agreement.

(1953). However, parol evidence cannot be used to contradict express terms of the contract itself. *Atl. N. Airlines v. Schwimmer*, 12 N.J. 293, 302 (1953).

For example, the court in *Siegmeister v. Benford* found that the plaintiff adequately stated a claim for fraudulent inducement because the plaintiff had relied, to his detriment, on the influential and fraudulent representation of the defendants. 2017 WL 2399573, at *6 (D.N.J. June 1, 2017). In *Siegmeister*, the plaintiff had sent the defendant a wire transfer to be applied toward the full payment of the diamonds he was to buy from them but never received any benefit in exchange. *Id.* *Network Commodities, LLC v. Golondrinas Trading Co., LTD.*, 2013 WL 1352234, at *6 (D.N.J. Apr. 1, 2013), provides another example. In that case, the defendants engaged in a deceptive and fraudulent scheme to induce plaintiffs to enter into shipping contracts for a future shipment in exchange for cash advances paid by the plaintiffs. *Id.*

Hercules argues that it has plausibly alleged fraud in the inducement based on two events. In September 2011, two representatives from Evonik allegedly indicated to Hercules that the MERP would continue. Ans. ¶ 91. In December 2011, the Evonik representatives allegedly repeated the representation that MERP would be used. Ans. ¶ 94. These allegations directly contradict the express terms of the 2012 and 2015 Supply Agreements. As discussed in the breach of contract section, Hercules' factual claims are completely undercut by the actual language in the 2012 and 2015 Agreements. Neither Supply Agreement mentions the terms "MERP" or "Regional Pricing" or "Differential Pricing." To the contrary, both Agreements set forth a formula and also detailed definitions as to how the purchase price was to be calculated. They both provide a base price and then explicitly state the independent documents that would be used as a yardstick for adjusting the price. Thus, such parol evidence cannot be used to substantiate the fraud in the inducement claim and without such evidence, fraud in the inducement count is not plausibly pled.

Since Count 8 appears to be the only basis for rescission of the 2012 and 2015 Agreements, Count 1 also cannot stand. Count 1 alleges breach of contract based on the violation of purchase orders but by its express terms, only exists if there is finding that the 2012 and 2015 Agreements are not valid. Therefore, neither Count 8 nor Count 1 are sufficiently pled.

<u>Count 4: Breach of Duty of Good Faith and Fair Dealing, Counts 5 and 6: Tortious Interference with Contract and Tortious Interference with Prospective Economic Advantage, and Count 7: Unjust Enrichment</u>

Because Counts 2 and 3 are not adequately pled, the remaining counts also do not survive a motion to dismiss. The remaining counts all rely on the underlying theory that Evonik agreed to the MERP.

The implied covenant of good faith and fair dealing is a "component of every contract" that requires both parties to a contract act in "good faith[,]" that is, they must "adher[e] to 'community standards of decency, fairness, or reasonableness.'" *Iliadis v. Wal-Mart Stores, Inc.*, 181 N.J. 88, 109 (2007) (internal citations omitted). Good faith "requires a party to refrain from 'destroying or injuring the right of the other party to receive its contractual benefits.'" *Id.* at 110 (citation omitted). To succeed on a claim for breach of the covenant of good faith and fair dealing, a party must prove that "(1) the [opposing party acted] in bad faith or with a malicious motive, (2) to deny the [party] some benefit of the bargain originally intended by the parties, even if that benefit was not an express provision of the contract." *Yapak, LLC v. Mass. Bay Ins. Co.*, 2009 WL 3366464, at *2 (D.N.J. Oct. 16, 2009). "In New Jersey, a plaintiff cannot maintain a claim for breach of the implied covenant of good faith and fair dealing when the conduct at issue is governed by the terms of an express contract or the cause of action arises out of the same conduct underlying the alleged breach of contract." *Kare Distribution, Inc. v. Jam Labels & Cards LLC*, 2012 WL 266386, at *7 (D.N.J. Jan. 30, 2012) (internal quotation marks omitted). Here, as pled,

Hercules is attempting to that which is prohibited: alter the express terms of 2012 and 2015 Agreements by including the term, "MERP," when it is not mentioned in either Agreement.

To state a claim for tortious inference with a contract under New Jersey law, a party must demonstrate (1) actual interference with a contract; "(2) that the interference was inflicted intentionally by a [an entity] who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage." *214 Corp. v. Casino Reinvestment Dev. Auth.*, 280 N.J. Super. 624, 628 (Law Div. 1994) (citing *Norwood Easthill Assoc. v. N.E. Watch*, 222 N.J. Super. 378 (App. Div. 1988)). A claim for tortious inference cannot survive if it is premised on a party's interference with its own contract. *See Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 173 (3d Cir. 2001) ("A cause of action for tortious interference with a contract cannot be directed against a defendant who is a party to the contract.") (citing *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 752-53 (1989)).

"[I]t is fundamental to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against [persons] who are not parties to the relationship." *Printing Mart-Morristown*, 116 N.J. at 752 (internal quotation marks omitted). At least one court, however, has suggested that this cause of action "may also be established by showing conduct not necessarily directed at the third party, but which improperly impinged upon the claimant's reasonably expected advantage from or with regard to that third party." *Central Paper Distribution Servs. v. Int'l Records Storage & Retrieval Serv., Inc.*, 325 N.J. Super. 225, 233 (App. Div. 1999). The court in *Central Paper* recognized that such a claim may exist "if there are proofs that defendants acted in ways which would not constitute a breach of contract and served unreasonably to deprive plaintiffs of economic benefits they had a right to expect." *Id.* at 234.

Here, Hercules claims that Evonik interfered with Hercules' agreement and relationship with Zarrin. Evonik acknowledges that Hercules has plausibly pled that Evonik knew of its relationship with Zarrin, but there are no plausible allegations that Evonik acted with malice. The entire allegation is based on Hercules' MERP theory, which is not plausibly pled.

To state a claim for unjust enrichment, a party must allege "'(1) that the [opposing party] has received a benefit from the [party], and (2) that the retention of the benefit by the [opposing party] is inequitable.'" *Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509, 519 (D.N.J. 2009), *aff'd*, 374 Fed. Appx. 341 (3d Cir. 2010). "Quasi-contract liability will not be imposed when a valid, unrescinded contract governs the rights of the parties." *Duffy v. Charles Schwab & Co.*, 123 F. Supp. 2d 802, 814 (D.N.J. 2000). "Since a plaintiff must confer a benefit on the defendant to support an unjust enrichment claim, this element has been interpreted by New Jersey courts as a requirement that 'the plaintiff allege a sufficiently direct relationship with the defendant to support the claim.'" *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 724 (D.N.J. 2011) (quoting *Nelson v. Xacta 3000 Inc.*, 2009 WL 4119176, at *3 (D.N.J. Nov. 24, 2009)). Furthermore, New Jersey's doctrine of unjust enrichment serves to protect a party's interest where an adequate remedy does not exist at law and equity demands restitution. *Cooper v. Samsung Elecs. Am., Inc.*, 2008 WL 4513924, at *9 (D.N.J. Sept. 30, 2008), *aff'd*, 374 F. App'x 250 (3d Cir. 2010). Again, because Hercules has not plausibly pled its MERP theory the unjust enrichment action is not sufficiently alleged.

For the foregoing reasons, Count 4, Count 5, Count 6, and Count 7 are dismissed without prejudice.

## V.   <u>CONCLUSION</u>

For the reasons stated above, Evonik's motion to dismiss the counterclaims is **GRANTED** without prejudice. Defendant has thirty days to file Second Amended Answer with Counterclaims addressing deficiencies noted herein. If Defendants fail to do so, then the counterclaims will be dismissed with prejudice.


Dated: October 18, 2018


John Michael Vazquez, U.S.D.J.